

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00042-CV

IN THE INTEREST OF G.J.W. AND
C.W.R. II, CHILDREN

------------

### FROM THE 324TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In three issues, Appellant Mother appeals the termination of her parental rights to G.J.W. and C.W.R. II.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

The trial court terminated Mother's parental rights to G.J.W. and C.W.R. II after finding by clear and convincing evidence that she had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that termination of her parental rights would be in the children's best interest.[2]  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (2) (West Supp. 2012).  This appeal followed.

## III. Termination of Parental Rights

Mother challenges the legally and factual sufficiency of the evidence to support the trial court's endangerment and best interest findings and the trial court's decision to appoint the Department of Family and Protective Services (DFPS) as G.J.W.'s sole managing conservator.

## A. Standards of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.  *Id.* § 161.206 (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair

_____

[2]The trial court terminated the rights of G.J.W.'s alleged father, R.A.M., who does not appeal.  The trial court appointed C.R., C.W.R. II's father, as C.W.R. II's possessory conservator.

2

procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and conservatorship). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In proceedings to terminate the parent-child relationship brought under family code section 161.001, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. *Id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

3

In evaluating the evidence for legal sufficiency here, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that section 161.001(1)(D), the endangerment-by-environment ground, was proven and that termination of Mother's parental rights was in the children's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated section 161.001(1)(D) and that the termination of the parent-child

4

relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(1)(D), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Evidence

Mother has three children—M.W.,[3] G.J.W. (born April 19, 2004), and C.W.R. II (born March 29, 2006)—a history of methamphetamine use,[4] and a ten-year history with Child Protective Services (CPS). DFPS filed the petition in this case on July 7, 2011, the day after Mother was arrested for outstanding warrants.

Mother, C.W.R. II's father C.R., and C.R.'s fiancee Selena[5] appeared at the July 27, 2011 show cause hearing, and the trial court ordered them to undergo drug testing. Mother tested positive for methamphetamine in numbers

---

[3]M.W. is around nine years old. Mother told the CPS investigator in this case that M.W.'s father had custody and that Mother was not allowed to visit M.W. without submitting to a urine drug screen. Mother testified that she had joint custody of M.W. but that the last time she had seen her was "[r]ight before the boys went into foster care" because she and M.W.'s father had verbally agreed that it would be best for her not to see M.W. "until this situation [with G.J.W. and C.W.R. II] is handled." Mother said that she called M.W. every Wednesday at seven o'clock.

[4]Mother started using methamphetamine when she was twenty-nine or thirty years old; she was forty-one years old at the time of the trial.

[5]We use pseudonyms for the names of any caregivers and family members, to protect the children's identities. *See* Tex. R. App. P. 9.8 & cmt.

5

indicating daily use over the preceding three-month period.[6]  C.R. tested positive for marijuana.

### 1. Mother

Elizabeth Pratt, a CPS investigator, testified that Mother's CPS history began in March 2003 with an allegation of physical abuse of M.W. and that her CPS history included at least seven referrals involving methamphetamine use.

Pratt recited that Mother had a June 2003 referral of neglectful supervision of M.W. involving methamphetamine; a November 2004 referral for physical neglect of G.J.W.; and two referrals in June 2005 for physical abuse, physical neglect, and neglectful supervision of G.J.W.[7]  CPS received another referral in April 2006, alleging that Mother was a domestic violence victim because she had been seen with a black eye and a bruise on her arm.  In November 2009, a referral for neglectful supervision of G.J.W. and C.W.R. II and physical abuse of G.J.W. by Mother was reported when G.J.W. went to school with a bruised right cheek.  In October 2010, CPS received two referrals about G.J.W. and C.W.R. II,

---

[6]Jim Turnage, the president and owner of the drug-testing company testified, and Petitioner's Exhibit 1 shows, that Mother's July 27, 2011 hair strand drug test results showed a methamphetamine level of 35,942 picograms and an amphetamine level of 5,597 picograms.  Turnage explained that anything above 7,500 picograms for methamphetamine was considered chronic or daily use.

[7]The June 21, 2005 referral indicated that "people had seen the baby in the room with drug use and that there were concerns that smoke was being put in the baby's face, and also bruises seen on the child."  This referral resulted in the opening of a family-based safety services (FBSS) case.  Mother completed her service plan in that case.

alleging neglectful supervision by Mother and Danny M. and physical abuse by Mother. In February 2011, another referral for neglectful supervision and physical neglect of G.J.W. and C.W.R. II and physical abuse of G.J.W. by Mother was reported. The referral included allegations that Mother was selling her food stamps for drugs, using methamphetamine daily, and using drugs in front of the children. Pratt acknowledged that all of these earlier referrals had been classified "unable to determine" or "ruled out."

Pratt received a referral involving G.J.W. and C.W.R. II on May 25, 2011, based on some concerns about Mother's behavior when she brought C.W.R. II to the emergency room at Cook Children's Hospital after he had been hit by a car. Pratt stated, "The reporter from the hospital indicated that they [sic] had concerns that [Mother's] behavior was erratic, and they were concerned about drug use."

Pratt visited Mother the next day at the home of one of Mother's friends, where Mother had been living with the children. Mother told Pratt that the children had been outside playing in the grassy area near the driveway. She had been inside, preparing the boys' lunches, when a visitor's car struck C.W.R. II. When asked why the children were not in school, Mother told Pratt that she was home-schooling them. Mother also told Pratt that the living arrangements were temporary and that she was working on getting a job and moving.[8] When Pratt asked Mother to sign a safety plan stating that the children would not be

---

[8]Mother did not provide Pratt with an address of where she might be moving.

7

unsupervised at any time, Mother refused, telling Pratt that she would not sign anything without a lawyer's advice. The referral was ruled "undetermined."

On May 31, 2011, Pratt received another referral, this one stating that Mother had threatened in a text to kill herself because she had failed her children. Pratt attempted to respond to the referral, but Mother had moved without a forwarding address. Mother called Pratt on June 1 and told her that she and the boys were staying at a Motel 6, that she had been having car trouble, and that she had sent a text to someone but had never threatened to kill herself. Pratt met Mother at the motel. Mother told Pratt that the motel was temporary because she had a friend who had offered her and the boys a place to stay until Mother could "get back on her feet and get a job." CPS helped Mother with financial assistance to get her truck fixed. Mother took the information Pratt gave her about housing resources but indicated that she wanted to stay in the Haltom City area because that was where her friends and support were and that she was not willing to go out of the area for shelter. Pratt acknowledged that the boys looked healthy when she saw them at the motel.

Pratt said that after the initial meeting at the motel, she was unable to reach Mother until she received a third referral on July 6, 2011, when the Haltom City police arrested Mother.

Haltom City Police Officer Caleb Haynes testified that at 5:30 p.m. on July 6, 2011, he responded to a call at a gas station for a welfare check on a woman and two boys who had been in the cab of a truck next to some of the gas station

8

pumps for around an hour during the hottest part of the day. Officer Haynes made contact with the driver, Mother.

Officer Haynes said that although both of the truck's windows were rolled down, the truck's cab was stifling, and the boys and Mother were sweating profusely. He could see no water in the truck, and the children's faces were red and flushed.[9] Officer Haynes said that he and his partner asked if they could get the boys out of the truck and get them some shade and some water, but Mother "adamantly refused," even though at one point she told them that she felt like she was going to pass out. Officer Haynes testified that Mother did not seem concerned about the children even though, in his opinion, they were in substantial danger from the heat. Officer Haynes's partner ultimately went into the gas station and got water for the boys. Officer Haynes said that when the officers gave the water to them, the boys "gulped it down ferociously."

Officer Haynes asked Mother to identify herself, and "[e]ventually, with some doing," she tossed her wallet to him. Mother did not have her driver's license, but her wallet had a debit or credit card with her name on the front of it, and she eventually gave him her date of birth. Officer Haynes described Mother as rude and dismissive and said that she avoided making eye contact with him. He also said that Mother "couldn't really stop shaking or moving" throughout the encounter, stating that Mother's hands, legs, and arms were shaking; that she

___

[9]Officer Haynes stated that the boys appeared clean although they were sweating and lethargic.

moved back and forth and was very jittery; and that she seemed paranoid. Based on his experience, he thought that methamphetamine use might be involved.

After Officer Haynes and his partner learned that Mother had multiple outstanding warrants for class C traffic tickets, they arrested her. Officer Haynes testified that when he told Mother that she was under arrest, Mother started yelling, cursing, and screaming at him and the other officer. She flailed about, kicking, cursing, and spitting, and he and the other officer had to "take her to the ground" before handcuffing her and placing her into the patrol vehicle.

Mother agreed that she was in her truck with the boys at a Haltom City convenience store on July 6. She explained, "My truck had broken down—or we ran out of gas and when it ran out of gas you'd have to let it cool off so we were—me and the boys were back and forth between the store and going back outside trying to start the truck." Mother said that Officer Haynes's testimony was incorrect, that she had bought several bottles of Gatorade, and that she and the children had already finished them and thrown them in the trash before the officer arrived.

Officer Haynes transported Mother to the police department, and his partner transported the children. At the police department, CPS was notified, and Mother was charged with resisting arrest. Pratt received the referral and went to the police station, but she was unable to speak with Mother that day. An officer told her that because Mother had been out of control—kicking, screaming,

10

cussing, and biting—they had had to place her in restraints. CPS placed the children with a foster family when Pratt was unable to contact either of the children's fathers.

Pratt testified that in light of Mother's positive July 27, 2011 drug test results, she had concerns about the children's environment and believed that they were in a dangerous environment with Mother based on the neglectful supervision from the 2011 referrals, the 2011 trip to the emergency room, the possible drug use, the positive drug test, Mother's frequent changes of address, Mother's lack of any personal items for the children, and her failure to enroll the boys in school, as well as Mother's extensive CPS history prior to May 2011. Pratt also testified that Mother's CPS referrals from 2003 to 2011 "were reports from hospitals, friends, neighbors, family members. It's never the same person. And that does show that there would be something that is substantially wrong in the family," even though none of the referrals prior to Pratt's receiving the case had been found "reason to believe." Pratt further testified that Mother's CPS history reflected many different addresses and that stability is a concern for children, particularly those of school age, because they need a routine, parental supervision, and a sense of security.

Tashani Fernandes, the children's CPS caseworker since August 11, 2011, testified that she had set up the following services for Mother: a psychiatric evaluation to evaluate Mother's mental health based on the May 31, 2011 referral CPS had received about Mother's alleged suicide comment;

counseling; parenting classes; and a drug and alcohol assessment. Mother also had visits with the children every two weeks,[10] and she was asked to comply with random drug testing and to provide paycheck stubs as proof of employment.

Paula Shockey, a licensed chemical dependency counselor at Recovery Resource Council (RCC), testified that she saw Mother on November 1, 2011, after receiving a referral for her from CPS for a drug and alcohol assessment. Mother told her that she had not used anything since July 2011, when she had used methamphetamine twice.[11] Mother also told Shockey that she had not worked for two weeks because she had been ill and unable to clean houses during that time and that she was living with a friend because she was homeless.

Shockey testified that if an individual says he or she has not used drugs in the last thirty days, that individual does not qualify for state-funded residential treatment, so she referred Mother to the CPS Roads of Information Education class and to Union Gospel Mission for housing assistance.[12] Shockey was unaware that Mother had subsequently gone to a twenty-eight-day residential treatment facility but said that the State would allow an individual to go directly to

---

[10]Mother said that she thought she had only missed three visits.

[11]Shockey stated that all of the information Mother gave her was self-reported and that RCC did not do drug testing. Mother stated in her paperwork that it had been five years since her last marijuana use and four months since her last methamphetamine use.

[12]Mother told Shockey that she wanted to go to residential treatment, but Shockey told her that she did not meet the criteria based on Mother's statement that she had not used methamphetamine since July 2011.

a provider and request entrance, "and it would be whatever they told that program about whether or not they got into that program." Shockey said that the Pine Street facility that Mother went to used recent drug use as a criterion.

Sarah Sanders, a licensed chemical dependency counselor, testified that Mother had been one of her inpatient clients at the Pine Street location of MHMR of Tarrant County. Mother, who reported to Sanders that she was homeless, stayed for the full twenty-eight days of treatment, from November 10, 2011, to around December 7 or 8, 2011, and met the minimum requirements, but Sanders said that, clinically, "there was still more stuff she could work on." Mother was discharged because she was very resistant to staying longer than the twenty-eight days. Sanders noted in Mother's discharge paperwork, "In the past week client demonstrated the belief that she knows what is best for her recovery and it does not matter what others recommend for her." Sanders's recommendations to Mother were that she complete an outpatient program, attend aftercare, attend ninety NA and AA meetings in ninety days, avoid game rooms, speak with her sponsor daily, seek employment, and obtain stable housing. Sanders said that if Mother failed to follow the discharge recommendations, her prognosis for remaining drug-free was very poor and that a relapse by Mother would not be surprising because "[i]t takes a large effort to stay sober and if you're not going to meetings and working your steps and working with a sponsor, it's a difficult thing to do." Mother's December 15, 2011 drug test was positive for methamphetamine.

13

In addition to the July 27, 2011, and December 15, 2011 drug tests, the trial court ordered Mother to take a drug test on January 4, 2012. Mother did not comply. She also did not comply with the trial court's order to take a drug test on May 14, 2012, and she refused to take a drug test at the CPS office on May 29, 2012. Mother's June 26, 2012 and September 6, 2012 drug tests were positive for amphetamine and methamphetamine. Turnage, the drug test witness, testified that Mother's September 6, 2012 drug test results showed almost double the amounts for methamphetamine and amphetamine from her July 27, 2011 results. Mother invoked her Fifth Amendment privilege not to testify when asked to explain why she had tested positive for methamphetamine; she agreed that she had used methamphetamine since completing in-patient rehab in December 2011 but did not remember the date of her last methamphetamine use.

Fernandes stated that based on Mother's drug test results, she believed Mother had continued to use illegal drugs, presenting a dangerous environment for her children. Fernandes said that Mother had not told her that she had done any aftercare or outpatient drug treatment after finishing rehab at Pine Street although Mother provided her with a sign-in sheet for AA and NA meetings in August 2011.

Mother testified that she had been to three sessions of Pine Street's aftercare in December 2011. Mother also said that she attended NA meetings no less than twice a week and that she had been going to NA for a year, and "pretty steady two, three times a week since June, July." Mother also said that she was

14

currently seeking another treatment facility and that she was on waiting lists for the Salvation Army, Union Gospel Mission, Nexus, and VOA Light.

Over the course of the seventeen months that the case was open, Mother did not provide any paycheck stubs or other kind of income statement. Mother explained that she was paid in cash for her housecleaning job and that she had not filed her 2011 income tax statement because she was not sure if she was able to file with the children on there. Mother said that she could clean one house a day, that she cleaned no less than five houses per week, and that she made $50 to $75 per house. As she had no vehicle, Mother had to get a ride to the houses that she cleaned and to her CPS services.

Mother agreed that C.R. had been paying her $51 per week in child support during the pendency of the case and said that she had spent the money on the children, using most of it to replace the children's things that had been lost in storage.[13] Mother said that she had bought remote-controlled helicopters for the boys using C.R.'s child support money but said she did not write down what else she had bought for them and did not keep any receipts. Mother agreed that she had not given any of the child support money to the foster parents.

Mother refused to undergo a psychiatric evaluation, telling Fernandes that she thought it was a violation of her constitutional rights, but she completed her

---

[13]The trial court took judicial notice of its temporary order from July 27, 2011, in which it had redirected C.R.'s child support obligation to DFPS.

parenting classes during her inpatient drug rehab.[14]   Fernandes set up counseling for Mother four times—in August 2011, May 2012, August 2012, and September 2012—but Mother never completed this service.  Debbie Boyles, a licensed professional counselor, testified that CPS referred Mother to her for weekly counseling in August 2011 but that they were unable to schedule an appointment until October 5, 2011, because of difficulty communicating with Mother via the phone numbers that Mother had provided to CPS.  Mother failed to appear at her October 5 appointment, but she appeared for the rescheduled appointment on October 12.

At the October 12 appointment, Mother told Boyles that she had problems with drugs; Boyles said that Mother seemed receptive to working on parenting, stability, and sobriety.  However, Mother did not appear at the appointment that they scheduled for October 19,[15] and Boyles did not see Mother again until over a year later, on November 15, 2012.

When Boyles saw Mother in November 2012, Mother told her that she had voluntarily gone to rehab, had been to parenting classes, had been "clean" since November 2011, had moved to Dallas and moved back, and was about to move again before Thanksgiving.  Mother cancelled her appointment on November 19

---

[14]Mother testified that she had also had parenting classes before and that she thought those had also been through CPS.

[15]Mother did not remember why she did not go to the October 19, 2011 counseling appointment.

16

because of her house-cleaning job, and although they rescheduled the appointment for November 26, the week before the termination trial began on December 3, 2012, Mother again failed to appear.[16]   Boyles said that one counseling appointment a year was insufficient to make any real progress. Mother agreed that she only went to counseling twice.

Mother said that between July 2011 and December 2012, she had lived in North Richland Hills, Haltom City, Dallas, and Fort Worth.  Fernandes testified that she received another address for Mother at the permanency hearing in September 2012.  Fernandes visited that address three days before the trial began in December because she wanted to see if it would be appropriate for the children and to see if Mother actually lived there.  Fernandes said that Mother was not there when she arrived but that she spoke with someone at the address who told her that Mother did not live there and that Mother had moved out a month before.  As of the time of the trial, Fernandes did not know where Mother was living.

Mother testified that she had just signed a lease on an apartment in Fort Worth on November 28, 2012, and before that, she had stayed in a "weekly apartment/hotel-type unit" after she moved from the Haltom City house where she had rented a room.  Mother rented the room in Haltom City in March 2012,

---

[16]Mother said that she did not go to the November 26, 2012 appointment because she had to work and because of transportation problems—her driver's license was suspended, she did not have a car, and she relied on her friends to drive her to work and appointments.

17

and before that, she had rented a room in Dallas from December 2011 to March 2012. Before that, she had lived in North Richland Hills for several months to a year, and before that, she had lived in Hurst. Mother had spent "a few nights or maybe a week" at Motel 6 when the CPS investigation began.

### 2. C.R.

Pratt spoke with C.R., C.W.R. II's father, after the children were placed in foster care. C.R. told Pratt that Mother moved around a lot and that he did not know how to get in touch with her and the children. C.R. also told Pratt that during his relationship with Mother "there was a little of [sic] partying and drug use," that he had used marijuana in the past, and that Mother had used methamphetamine in the past.[17] C.R. said that his last use of marijuana had been in either June or July 2011 but he had not used any illegal drugs since then, that he had to take—and had passed—random drug tests at work, and that he felt he had matured in the last four or five years.

Mother said that when she had started seeing C.R.—around her thirty-third birthday—he told her that he was twenty-six, but she learned his real age from his mother on his eighteenth birthday. C.R. had a possession of a controlled substance case from 2005, which he said was when he was "an eighteen year old kid." He went on probation for the offense. Mother testified that during her

---

[17]At trial, C.R. acknowledged that he had used methamphetamine with Mother but said that he did not use it now. He stated that his last methamphetamine use had been four or five years before.

18

pregnancy with C.W.R. II, she and C.R. got into an argument, C.R. hit her more than once,[18] and one of their friends called the police. Mother said that she later signed an affidavit of nonprosecution because C.R. was on probation and she did not want him to go to prison, but C.R. said that Mother had lied when she had accused him of assault.

C.R. testified that he had completed all of his CPS services and had been paying child support for C.W.R. II since June 2007. He had been an assistant general manager at Taco Cabana for five years and explained that he was late in completing his CPS services because he had been working six to six-and-a-half days a week while his restaurant was short-staffed and because of some family crises: his father had just passed away, and his mother had liver cancer. C.R. said that he had a four-bedroom home, which he bought after his father died, and that he was receiving his own restaurant the week after trial.

C.R. said that he worked between forty and fifty hours per week and that Selena would take care of C.W.R. II when he was not home, as she took care of her son and the son that they had together. He and Selena planned to marry as soon as they could save up the money. C.R. said that if he were awarded possession and later full conservatorship of C.W.R. II, Selena wanted to adopt the child if Mother's parental rights were terminated.

---

[18]Mother said that C.R. had hit her somewhere on her body but she did not remember where.

19

C.R. said that he loved G.J.W. as a child but not as a son. In 2009, when C.R. fell in love with Selena and wanted to settle down and start a family, he stopped seeing G.J.W. because he had other family to take care of and he felt that was the right thing to do because G.J.W. was not biologically his. Then Mother stopped letting him see C.W.R. II, telling him that he could not see C.W.R. II unless he also saw G.J.W. C.R. complained that it was difficult to contact Mother because "[s]he was moving around from place to place[,] from boyfriend to boyfriend." C.R. had to see his son at C.R.'s mother's house, because Mother would still let C.R.'s mother see the child. C.R. said that when the boys would come over to his mother's house, they would be wearing clothing that he did not approve of, so he would "get them dressed right and send them back home."

C.R. said that while C.W.R. II had never lived with him, C.R. had a court order for every other weekend "and holidays and things but [he] was getting [C.W.R. II] more often than that," because anytime Mother needed to do things or wanted a babysitter, he always took the boys. C.R. said that he wanted C.W.R. II to come live with him "[m]ore than anything" and that he wanted for C.W.R. II to continue to have a relationship with G.J.W., through either monthly visits or visits every weekend. He also said that he and the foster family lived nearby and that he had become really close with the foster parents during the case. C.R. said that C.W.R. II had a good relationship with his two-year-old half-brother, as well as Selena's nine-year-old son.

20

### 3. Selena

Selena, who had been in a relationship with C.R. since February 2009, testified that they saw C.W.R. II every weekend until Mother stopped dropping him off at C.R.'s mother's house. Selena said they wondered what was going on but could not find Mother to ask her.

Selena had a single encounter with CPS in 2007 or 2008 when her boyfriend at the time threw her stuff and her son's stuff into the swimming pool. Her son was not present because he was living with his father in San Antonio at the time, and after CPS talked with her son's father, "it was cleared." Selena had completed probation for a DWI that had occurred during the same time period, but she did not have her driver's license back because she owed around $1,500 in fines. Selena and C.R. were budgeting to pay the fines with their income tax return in February, and C.R. and Selena's mother were driving the children until then. However, Selena also acknowledged that she sometimes drove when she had to.

Selena was a stay-at-home mother but planned to go to work after she completed her education. She said that their house had room for C.W.R. II and that her boys were ready for him to move in. She and C.R. planned to get married, and she was willing to adopt C.W.R. II.

### 4. Camilla

Camilla testified that she was G.J.W. and C.W.R. II's foster mother. In July 2011, the boys were placed with her, her husband, and their teenaged son in the

21

house where the family had lived for over eight years. By the time of the trial, G.J.W. and C.W.R. II had lived with the foster family for seventeen months and were eight years old and six years old, respectively. Camilla said that they had learned of G.J.W.'s bed-wetting issue on the first night that he was with them and that both boys had dental problems: C.W.R. II had to have a root canal and two cavities filled, and G.J.W. had four cavities and had to have a tooth extracted because the root was protruding through his top gum.

Camilla testified that when the boys moved in, she asked them what kind of food they liked to eat, and they told her bologna and catsup sandwiches. Camilla started feeding them more balanced meals.

When school started in August 2011, although G.J.W. was supposed to enter the second grade, they were unable to locate school records to show that he had completed the first grade.[19] G.J.W. told Camilla that he had only attended a couple of weeks of first grade, so he was placed back in first grade again, where he struggled with reading.[20] Camilla testified that after completing the first grade, G.J.W. was still somewhat behind in reading and spelling but that he had caught up on math and science; he was in the second grade at the time

---

[19]G.J.W. did not know the name of his school.

[20]Mother testified that she had enrolled G.J.W. in first grade at Richland Hills Elementary and that she was aware of his reading problems because she had had a conference with his teacher. Mother said that she had seen the teacher daily because she took G.J.W. and C.W.R. II to school and picked them up.

of the trial. By the time of the trial, C.W.R. II had completed kindergarten and started the first grade. Other than sometimes writing his letters backwards, he was able to read fairly well and was on-target according to his teachers. Camilla said that the boys got along very well with other children.

Camilla described the family's activities, including eating at a restaurant on weekends, going to the movies and the park, swimming in the summer, going to children's church, and traveling to visit extended family. She testified that the boys enjoyed these activities and that they fit very well into the family. She described G.J.W. as "a very cheerful, happy little boy," and she said that he had told her that he wished Mother had played with him more but that she slept a lot. Camilla said that if G.J.W. and C.W.R. II became available for adoption, she and her husband wanted to adopt them.

Camilla testified that she and her husband had met C.R., had developed a relationship with him, and had a plan in place so that if C.W.R. II went with C.R., the children could maintain contact. She stated, "We would like to extend continuing to take [C.W.R. II] to church, if that was at all possible, because he does like it so much. We'd also like to have at least monthly, or biweekly visits over the weekend" and play dates. Camilla stated, "I think if [G.J.W.] never saw [C.W.R. II] again, I think that would be heartbreaking for him." C.W.R. II had told Camilla that he enjoyed his visits with his father and his two-year-old half-brother.

Camilla stated that if C.W.R. II went with C.R. while G.J.W. stayed with the foster family, her plan was to adopt G.J.W. and for both children to have therapy

to ensure that the transition went well.  She testified that even if the trial court did not terminate Mother's parental rights, she was willing to maintain the children in her home long-term and that if the trial court gave custody of C.W.R. II to C.R., the child could stay with her through the end of December so he could finish the school semester.

### 5. Environment

When asked whether caring for children and using methamphetamine placed the children in a dangerous environment, Sanders, the licensed professional counselor who had worked with Mother at Pine Street, stated, "While you're on methamphetamine, it makes it difficult to appropriately supervise your children.  Plus, when you're in that culture[,] you are more subject to dangerous activities than someone who does not use illegal drugs."  Sanders also agreed that multiple moves would not indicate a stable environment for children.  Pratt, the CPS investigator, also testified that when parents are using drugs, they are distracted and not able to be appropriate parents for their kids.

When asked whether her children were safe with someone who is using methamphetamine, Mother replied, "I don't really know how to answer that question."  When asked the same question again, however, Mother replied, "No, not while the person is on methamphetamines with them, no."

Fernandes testified that she did not recommend returning the children to Mother because Mother continued to test positive for illegal drugs and had not completed her individual counseling.  She also said that because Mother had

24

moved around so much, CPS did not know where Mother was living and did not know if her home was appropriate for the children. Fernandes further explained that Mother had not shown a willingness and ability to care for her children and that it was not fair for the children to continue to wait for Mother to get her life together because they needed permanency.

C.R. agreed that Mother had raised C.W.R. II from birth, that he never saw any evidence of abuse or neglect, and that he had never tried to obtain custody, but he also stated that he believed that it was in C.W.R. II's best interest to live with him. He agreed that a child is placed in a dangerous environment when he is raised by someone who is using methamphetamine and that if Mother had been using methamphetamine, she had placed C.W.R. II in a dangerous environment. C.R. testified that he had suspected that Mother had been using methamphetamine while raising C.W.R. II, that he was concerned at the time, and that he felt remorse for having done nothing about it.

### 6. Best Interest

Fernandes stated that G.J.W. appeared to be bonded to Camilla and called her "Mom," and that he appeared to be happy in the foster home. She testified that G.J.W. and C.W.R. II were bonded but that it was in C.W.R. II's best interest to be returned to his father, although it would also be important to maintain the sibling relationship between G.J.W. and C.W.R. II. Fernandes said that, subject to the trial court's approval, CPS would start C.W.R. II with overnight visits with C.R. on the weekends so that C.W.R. II could finish school until

Christmas break and then start at a new school in C.R.'s area in January. Fernandes said that C.R. finished his CPS service plan,[21] that C.R.'s home was appropriate, that C.W.R. II had a half-brother who lived with C.R. and Selena, and that C.R. had a stable job.

Fernandes recommended terminating Mother's parental rights to the children as in the children's best interest and explained that if the trial court terminated Mother's parental rights, C.W.R. II would be placed with C.R., and G.J.W. would be adopted by his foster family. Fernandes stated that as long as CPS was involved with the children, CPS would ensure that G.J.W. and C.W.R. II continued contact and that, based on her dealings with the foster family and C.R., she believed they would also continue the children's relationship.

Mother testified that she should have her children back "[b]ecause they're [her] children and they've been with [her] other than the seventeen months they've been in foster care," and because "there's been no proof that they've been abused, neglected, unloved. There's no proof of drugs. No criminal history." Mother amended her answer to state that there was no proof of drugs "[o]ther than the last seventeen months." Mother said that she felt she took good care of the boys, that she had never hurt them, and that all of their immunizations were up to date. Mother agreed that her children should not have to wait at all

---

[21]CPS asked C.R. to complete individual counseling, parenting and fatherhood classes, and random drug testing and to maintain stable housing and employment. All of C.R.'s drug tests were negative except for the initial July 27, 2011 test, which was positive for marijuana.

26

for her to get everything together for them. Mother testified that she did not want the boys to be separated and that she had concerns about Selena's methadone use,[22] but she said she had no objections to C.R. as a father.

C.R. agreed with CPS's plan for C.W.R. II to stay with the foster family until the end of the semester and said that if the trial court felt that it was in C.W.R. II's best interest to remain in the same school as G.J.W., he would make that work too. C.R. said that he was a hands-on caregiver and helped with the cleaning, cooking, and childcare and that Selena would help him, as well as Selena's mother and his mother. C.R. asked the trial court to place C.W.R. II with him and said that he was in agreement with DFPS's request to terminate Mother's parental rights to C.W.R. II. He said that C.W.R. II was bonded with Selena and that the entire family—he, Selena, C.W.R. II, and the other two children in the home—were all attending family counseling together and had been doing so for eight weeks.

James, Mother's biological father, testified that he was willing to take the children. However, he also testified that he did not know about G.J.W. and C.W.R. II until the week before trial because after he and Mother's mother divorced in 1975, he did not see Mother until 1993. 1993 was also the last time that James had had contact with Mother until the Friday before trial because he

---

[22]Selena testified that when she was pregnant, she had been prescribed Vicodin and had become addicted to it. Her doctor prescribed methadone to treat the Vicodin addiction, and she had been taking it for two years, stating that she was "coming off of [the methadone] as fast as they let [her]."

27

could not find her.  James said that he did not have any CPS history, that he was retired, and that he owned a two-bedroom trailer twelve miles outside of Huntsville.  Mother told James that her mother would not help her.

The children's ad litem attorney, Karmen Johnson, reported that she had seen visits between Mother and the children and C.R. and the children.  She had visited C.R.'s home but not Mother's because she had never received an address to check on Mother's home.  She visited with the children and said there was no question that the boys loved both Mother and C.R.  Johnson further stated,

> The boys have indicated to the foster parents and to the caseworker that they wish their mom could live like they live.  And I think that's very telling for these boys.
>
> Much as I hate to split siblings . . . [C.W.R. II's] father has done everything that's been requested of him to do in order for this child to live in his home.  I think it would be a disservice to [C.W.R. II] not to allow him to have his father in his life on a full time basis.

Johnson added that it seemed apparent from the foster parents, the caseworker, and C.R. that sibling contact was something that everyone was interested in maintaining, and she noted that the problem throughout the case had been Mother's lack of cooperation.  Johnson stated that the only way she could see for the boys to have stability and permanency in their lives was to terminate Mother's parental rights to them.

## C. Endangerment

In her first issue, Mother argues that the evidence of endangerment is legally and factually insufficient because DFPS relied on her difficulty in finding appropriate housing and her relapse into drug use while offering no evidence that the children were emotionally or physically endangered under their existing living conditions.

Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also* Tex. Fam. Code Ann. § 161.001(1)(D). Under subsection (D), we must examine evidence related to the children's environment to determine if it was the source of endangerment to the children's physical or emotional well-being. *D.T.*, 34 S.W.3d at 632. It must be the environment itself that causes the children's physical or emotional well-being to be endangered, not the parent's conduct, and there must be proof that the parent was aware of the potential for danger to the child in such an environment and disregarded the risk. *In re C.D.E.*, 391 S.W.3d 287, 296 (Tex. App.—Fort Worth 2012, no pet.). However, although the focus of subsection (D) is on the children's living environment and not the parent's conduct, the parent's conduct may produce an endangering environment. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Illegal drug use by a parent supports the conclusion that the child's surroundings endanger his or her physical or emotional well-being. *See In re I.C.W.*, No. 02-12-00226-CV, 2013 WL 173746, at *3 (Tex. App.—Fort Worth

29

Jan. 17, 2013, no pet.) (mem. op.); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that the evidence was legally and factually sufficient to support termination under subsections (D) and (E) when the evidence showed that Mother exposed her children to domestic violence, placed them in an environment of drug use, and refused to participate in her CPS service plan). Subsection (D) permits termination based on a single act or omission, and conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *Jordan*, 325 S.W.3d at 721.

Here, Mother's July 27 drug test results reflected that she had been using methamphetamine for the three months prior to the test, which would have been May, June, and July. During that time, CPS received three referrals about her. The first, on May 25, indicated that Mother's behavior when she took C.W.R. II to the hospital appeared erratic and might be related to drug use. The second, on May 31, involved a text by Mother that allegedly mentioned suicide, and the third, on July 6, reported Mother's arrest after her encounter with Officer Haynes. Officer Haynes testified that Mother's behavior—including her inability to stop moving around—made him think that methamphetamine might be involved, and in November, Mother told Shockey, the RCC counselor, that her last methamphetamine use had been in July. When asked whether her children were safe with someone using methamphetamine, Mother ultimately acknowledged that they were not. Based on this evidence, we conclude that the trial court could

30

have reasonably formed a firm belief or conviction that Mother had endangered the children by knowingly placing or knowingly allowing the children to remain in conditions or surroundings that endangered their physical or emotional well-being under subsection (D), and that the evidence is therefore legally sufficient to support the finding. We overrule this portion of Mother's first issue.

Further, Sanders and Pratt both testified that using methamphetamine makes it hard to appropriately supervise or parent children, and over the course of the case, Mother continued to test positive for drugs, including right after leaving inpatient drug treatment. C.R. agreed that a child is placed in a dangerous environment when raised by someone who uses methamphetamine and that he had suspected Mother had been using methamphetamine while caring for C.W.R. II. Mother's erratic behavior also manifested itself in her continuous relocation from place to place and her refusal, according to Officer Haynes, to let her children out of a stifling truck parked at a gas station in July, even though she told him that she felt like she might pass out. Giving due deference to the trial court, it could have reasonably formed a firm conviction or belief that Mother had not only endangered the children's physical or emotional well-being under subsection (D) before the CPS case began but also that Mother would continue to do so. Therefore, we conclude that the evidence is also factually sufficient to support the trial court's finding, and we overrule the remainder of Mother's first issue. *See In re A.H.*, No. 02-06-00064-CV, 2006 WL 2773701, at *3 (Tex. App.—Fort Worth Sept. 28, 2006, no pet.) (mem. op.)

31

(noting that stability and permanence are paramount in the upbringing of children, that an endangering environment can be created by a parent's involvement with methamphetamine, and that a factfinder may infer from past conduct endangering the children's well-being that similar conduct will recur if the children are returned to the parent).

## D.  Best Interest

In her second issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's best interest finding because DFPS presented no evidence of the children's desires and no evidence that the children were "ever physically harmed, endangered, or anything less than properly clothed, fed, and happy while in [Mother's] care and custody."

There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).  The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:  the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to

32

effect positive environmental and personal changes within a reasonable period of time; whether an adequate social support system consisting of extended family and friends is available to the child; and whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with guidance and supervision consistent with the child's safety and a safe physical home environment. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Here, the two children, ages eight and six, had been moved around by Mother while she used methamphetamine, and their foster mother testified about their dental problems and poor diet prior to moving in with her family seventeen months before trial, as well as G.J.W.'s difficulty with reading and bed-wetting. Mother claimed that she had been aware of G.J.W.'s reading issue and that she had enrolled him in the first grade, but she also told Pratt that she had been home-schooling the children. Mother participated in two counseling sessions in two years, tested positive for drugs a week after completing inpatient rehab, and relocated again shortly before the trial, preventing CPS from visiting her home to see if it was appropriate for the children. While the foster mother and C.R. testified about their support systems, Mother's biological father James had not heard from Mother since 1993 before she contacted him the week before trial; he was willing to take the children but testified that Mother told him that her mother would not help her.

Further, although Mother complains that there was no evidence of the children's desires, Johnson, their ad litem attorney, informed the trial court that

34

the children had told their foster parents and CPS caseworker that they wished that Mother could live like they were living. Camilla, the boys' foster mother, testified that G.J.W. told her that he wished Mother had played with him more but that she slept a lot. And we have already addressed above the endangering environment in which Mother had placed the children. Mother did not testify about her plans for the children, while Camilla testified that she would adopt both boys, if they became available, or just G.J.W. if C.W.R. II went to C.R. C.R. testified that he wanted C.W.R. II to live with him, and the CPS caseworker testified that CPS's plans for the children were for Camilla to adopt G.J.W. and C.W.R. II to go to C.R., with plans to keep the children's sibling relationship together. Camilla and C.R. both expressed their desire to maintain the children's sibling relationship and explained their plans to help facilitate the transition for the children. C.W.R. II told Camilla that he enjoyed his visits with his father and his half-brother. Both Camilla and C.R. testified about their stable homes, while Mother testified that she had just signed a lease on an apartment during the week before the trial began.

Based on all of the above, and applying the appropriate standards of review, the trial court could have found the evidence both legally and factually sufficient that termination of Mother's parental rights to G.J.W. and C.W.R. II would be in the children's best interest. *See H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. Therefore, we overrule Mother's second issue.

35

### E. Managing Conservator

In her final issue, Mother complains that the evidence is legally and factually insufficient to support the trial court's appointment of DFPS as G.J.W.'s sole managing conservator because DFPS presented no evidence to support that such an appointment was in G.J.W.'s best interest and because separating G.J.W. and C.W.R. II was not in the children's best interest. *See* Tex. Fam. Code Ann. §§ 153.002, .005 (West 2008).

Under section 153.002, "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.* § 153.002. Under section 153.005(b), a managing conservator must be a parent, a competent adult, an authorized agency, or a licensed child-placing agency. *Id.* § 153.005(b). "Conservatorship determinations, in contrast [to termination decisions], are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable." *J.A.J.*, 243 S.W.3d at 616.

Contrary to Mother's argument, as set out above in our best interest discussion, there was both legally and factually sufficient evidence that terminating Mother's parental rights to G.J.W. was in his best interest and that the appointment was necessary in order to place G.J.W. "for adoption in a suitable home." Further, the record reflects that C.R. completed all of his services, had had a stable job for several years, had established a stable home with Selena, their child (C.W.R. II's other half-brother), and Selena's child, and

36

wanted C.W.R. II to come live with him and for Selena to adopt C.W.R. II. The trial court's order appointed DFPS as both children's permanent managing conservator and appointed C.R. as C.W.R. II's possessory conservator, in line with the plan for C.R. to eventually become C.W.R. II's permanent managing conservator. C.R., Camilla, and the children's CPS caseworker testified about their plans to maintain the sibling bond between G.J.W. and C.W.R. II. Therefore, under the circumstances presented by this case, we cannot say that the trial court's decision was arbitrary or unreasonable, and we overrule Mother's third issue.

## IV. Conclusion

Having overruled all of Mother's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, J.; LIVINGSTON, C.J.; and GABRIEL, J.

DELIVERED: June 20, 2013

37